UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANTONIO C. SIMONELLI,

  Plaintiff,

v.

COUNTY OF MONTEREY, et al.,

  Defendants.

Case No. 17-cv-01448-SVK

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**

Re: Dkt. No. 32

Before the Court is the motion of Defendants County of Monterey and Andre Roberts for summary judgment or, alternatively, partial summary judgment. ECF 32. The parties have consented to the jurisdiction of a magistrate judge. ECF 5, 9. The Court held a hearing on the motion on June 5, 2018. Based on the materials submitted, the arguments made at the hearing, the record in this case, and the relevant law, the Court ORDERS that Defendants' motion is GRANTED IN PART and DENIED IN PART. Specifically, for the reasons discussed below, the Court GRANTS partial summary judgment in favor of Defendants on (1) Plaintiff's Section 1983 claim against Deputy Roberts insofar as it is based on the alleged violation of Plaintiff's First Amendment rights; (2) Plaintiff's Section 1983 claim against Deputy Roberts insofar as it is based on the alleged October 21, 2016 incident; (3) Plaintiff's Section 1983 claim against the County; and (4) Plaintiff's ADA claim against both Defendants. Defendants' motion for summary judgment is otherwise DENIED.

## I.      Factual Background

Defendants dispute many of the facts concerning the events giving rise to this lawsuit but argue that they are entitled to summary judgment even accepting Plaintiff's version of those events. Accordingly, this factual discussion is based primarily on Plaintiff's recitation of the facts.

Plaintiff Antonio Simonelli claims he is admitted to practice law in Utah, the District of

Columbia, U.S. Tax Court, and several other federal courts. ECF 1 ("Complaint") at ¶ 8. He is not admitted to practice in California. ECF 32-2 ("Simonelli Depo.") at 97. Plaintiff claims that he has various health conditions that affect his balance, coordination, walking, running, and fine motor abilities (including his ability to write on paper) as well as his eyes and vision. Complaint at ¶ 9.

When the incidents at issue occurred, Plaintiff's mother, Jacqueline Simonelli, was a plaintiff in a takings case against the City of Carmel-by-the-Sea ("Carmel") pending in Monterey County Superior Court. *Id.* at ¶ 11. Plaintiff's mother appeared in that case *pro se,* but Plaintiff assisted his mother by attending several court hearings in Department 15 of the Monterey County Superior Court with her, including on at least three occasions prior to April 8, 2016. *Id.* at ¶ 13; Simonelli Depo. at 45.

## A. April 8, 2016 incident

On April 8, 2016, Plaintiff and his mother were in Department 15 for a hearing in the takings case on a bill of costs filed by Ms. Simonelli. When the hearing began, Plaintiff sat with his mother at counsel table. During the hearing, an issue arose concerning a motion to tax costs filed by Carmel. At some point, Carmel's attorney, Ryan Donlon, objected to Plaintiff's participation in the hearing because Plaintiff was not admitted to practice in California. The judge then asked Plaintiff to take a seat in the audience. Simonelli Depo. at 54.

During a court recess, Plaintiff and Donlon went into the hallway to discuss service of the motion to tax costs. Plaintiff testified in his deposition that during the conversation, he and Donlon "were raising our voices." *Id*. at 59. Another lawyer who was sitting in the hallway gave Donlon his contact information in case Donlon needed a witness to his conversation with Plaintiff. *Id.* at 57-58. Donlon and the lawyer-witness then returned to the courtroom, and Plaintiff followed. *Id.* at 62.

Back in the courtroom, Plaintiff sat across the aisle from the lawyer-witness. *Id.* at 58-59. Plaintiff testified that he got up from his seat, crouched over, and asked the lawyer-witness for his name or business card, but the lawyer-witness did not provide either. *Id.* at 63-64. Plaintiff claims he made two such requests in a quiet voice. *Id.* Deputy Roberts testified that there is not a "no

2

talking" policy in Department 15:

Q:  All right.   And when you hear -- and so I take it that if -- when you hear people talking, what do you do?

A:  If they're whispering --

Q:  Excuse me?

A:  If they are whispering --

Q:  Uh-huh.

A:  -- I don't do anything.   If they're talking at the level that you and I are talking –

Q:  Uh-huh.

A:   -- then I would just look at them.

Q:  Okay.   What happens if they don't see you?   I mean, because for example, somebody's back could be to you or his head could be turned away.   What do you do then?

A:  Then I will look at the person that they're talking to.

Q:  Okay.   And what happens if that doesn't work?

A:  Then I'll walk over to them and ask them to lower their voices.

Q:  Okay.   And if that doesn't work, what happens?

A:  Then I ask them to take their conversation outside.

Q:  Okay.   And if that doesn't work, what happens?

A:  Then I'll call a partner and I'll help them walk outside the front door to take their conversation outside.

Q:  When you say you call a partner, you mean another deputy sheriff?

A:  Yes.

Q:  I mean, you wouldn't be calling a non-law enforcement person; right?

A:  No.

Q:  Why would you call a partner?

A:  Just so they can stand by to observe what I'm doing and that I'm asking the individual several times to step outside the courtroom because they're talking loud.

Ex. 4 to ECF 39-2 ("Roberts Depo.") at 43-44.

According to Plaintiff, after he whispered his requests to the lawyer-witness, Deputy Roberts approached Plaintiff and said he was causing disorder in the courtroom.  Simonelli Depo. at 68-69.  Then, without any warning to Plaintiff to lower his voice or leave the courtroom, Deputy Roberts grabbed Plaintiff's arm and forced him out of the courtroom and into the hallway. *Id.*  As Plaintiff was removed from the courtroom, court was apparently still in session because he saw the judge on the bench.  *Id.* at 76.  Plaintiff claims Deputy Roberts held onto Plaintiff's arm until they were in the hallway outside the courtroom, then punched Plaintiff in the chest with a closed fist with enough force to cause Plaintiff to move his feet.  *Id.* at 69, 77.

Plaintiff claims that he then said to Deputy Roberts, "Now you have assaulted me twice," and that Deputy Roberts responded, "If I had assaulted you, you would be on the floor right now." ECF 39-1 ("Simonelli Decl.") at ¶ 14.  Plaintiff claims he said, "I'm not going anywhere."  *Id.* Deputy Roberts then called for backup.  *Id.*  Plaintiff says he asked Deputy Roberts for a business card, to which Roberts allegedly responded, "This is the superior court in the County of Monterey in the State of California.  This isn't Utah."  Roberts then returned to the courtroom.  *Id.;* Simonelli Depo. at 77.

When the backup deputy sheriff, identified by the County as Deputy Gregory Borg, arrived in the hallway outside Department 15, Plaintiff asked him to tell Deputy Roberts that Plaintiff had limited vision and mild cerebral palsy.  *Id.* at 79.  Deputy Borg agreed to do so.  *Id.*  Plaintiff also explained that he had been asking for the lawyer-witness's business card or name.  *Id.*  Plaintiff claims that Deputy Borg told him to "stay here" and said he would ask the lawyer-witness for his name or card.  *Id.*  Deputy Borg entered the courtroom and returned to the hallway several minutes later, saying he could not get the man's name or card.  Deputy Borg then left within one or two minutes.  *Id*. at 92.

Plaintiff's mother came into the hallway while Deputy Borg was in the courtroom.  *Id.* at 82-83.  Plaintiff told her what had happened, and she said she did not want to go back into the

courtroom.[1]  *Id.* at 83.  When after waiting five or ten minutes no one had come out to tell them what was happening, they left.  *Id.* at 83-84.  Plaintiff claims that after he and his mother left the courtroom, the judge resumed the hearing on the takings case and made certain statements about the motion for costs, which was discussed further at a hearing on April 22, 2016.  Simonelli Decl. at ¶¶ 20-22.

Plaintiff admits that Deputy Roberts' alleged conduct in removing Plaintiff from the courtroom and striking his chest did not leave any bruise or other mark on Plaintiff and that he did not suffer any physical injury.  *Id.* at 98-99.

Deputy Roberts denies making any physical contact with Plaintiff during the April 8, 2016 incident or at any other time.  Roberts Depo. at 84, 140.

## B.  Events following April 8, 2016 incident

Plaintiff appeared in Department 15 at least four times between April 8 and October 21, 2016.  Simonelli Depo. at 102-106.  Deputy Roberts was present on at least two of those occasions.  *Id.*  On those occasions, as on the three to five occasions prior to April 8, 2016 when Plaintiff was in Department 15 with Deputy Roberts as bailiff, Plaintiff concedes there were no interactions and no incidents between the two men.  *Id.*

## C.  October 21, 2016 incident

On October 21, 2016, Plaintiff appeared in Department 15 for another hearing in the property takings case.  Simonelli Depo. at 106.  By this time, Plaintiff had been joined as a party to the case.  Simonelli Decl. at ¶ 23.  Deputy Roberts was present at the October 21 court session.  *See* Simonelli Depo. at 115.

According to Plaintiff, before court was in session, he attempted to speak to the court reporter, but Deputy Roberts told him, "You can't go over there."  Simonelli Decl. at ¶ 26.  When the court called Plaintiff's case, he asked the judge if he could ask the reporter a quick question, but the judge said he would have to ask the reporter later.  *Id.* at ¶ 27.  After the hearing was over,

---

[1] Defendants state that they repeatedly tried to take the deposition of Plaintiff's mother, Jacqueline Simonelli, but were informed each time that she was too ill to be deposed.  ECF 32 at 3 n.1.  At the summary judgment hearing, Plaintiff's counsel stated that Ms. Simonelli will not testify at trial.

the court reporter indicated to Plaintiff that he could speak to her. Simonelli Depo. at 112. Plaintiff then approached the court reporter and advised her that, because of his vision problems, he could not see her if she gestured for him to speak more slowly and that he needed a verbal cue in such a situation. *Id.* Plaintiff then attempted to retake his seat in the courtroom.

Plaintiff claims that before he could sit down, Deputy Roberts approached him, stood directly in front of him, and placed his hand against Plaintiff as if he intended to push Plaintiff down. Simonelli Decl. at ¶ 29. Plaintiff's father stood up and asked what this was about. Deputy Roberts removed his hand and said, "You are not allowed to talk in this courtroom." Officer Roberts directed both Plaintiff and his father to leave. They did so, with Plaintiff's father walking between Plaintiff and Officer Roberts. *Id.* Plaintiff admits that he did not lose his balance when Officer Roberts touched him and that there was no bruise or other physical mark after Deputy Roberts removed his hand. Simonelli Depo. at 116.

Plaintiff alleges that in the hallway, Deputy Roberts showed Plaintiff a pad of paper and told Plaintiff he had to write down any questions and give them to Deputy Roberts to pass on to the court reporter. Simonelli Decl. at ¶ 30. Plaintiff did not respond to Deputy Roberts' statement and left the courthouse. *Id.*

Although Deputy Roberts recalls Plaintiff's interactions with the court reporter on October 21, 2016, he denies that he told Plaintiff he could not speak with the court reporter, that he discouraged Plaintiff from talking with the court reporter, that he told Plaintiff and his father that they had to communicate with the court reporter in writing, or that he made any physical contact with Plaintiff. Roberts Depo. at 141.

### D. Plaintiff's government claim and investigation

Plaintiff did not lodge any verbal or written complaint with the Sheriff's Office or the Superior Court. Instead, on or about September 23, 2016, Plaintiff filed a government claim with the County concerning the April 8, 2016 incident, pursuant to California Government Code § 910 *et seq.* Simonelli Decl. at ¶ 24 and Ex. 3. The claim included Plaintiff's detailed version of the events of April 8. *Id.* The claim was rejected on October 3, 2016. *Id.* According to the County, because Plaintiff filed a government claim "instead of a personnel investigation, the

6

documentation and results of which would have been discoverable, the County's investigation was conducted entirely by or at the direction of the Office of County Counsel" and thus "documentation of the County's investigation consists almost entirely of material protected by the attorney-client privilege and the attorney work product doctrine." ECF 40 ("Reply") at 12. The County asserts, without support, that "Deputy Roberts did not face disciplinary action because the County determined that Plaintiff is not credible and that Deputy Roberts did nothing wrong." *Id.*

For his part, Plaintiff alleges that the County failed to conduct a reasonable investigation. Complaint at ¶ 47. The fact Plaintiff cites to in support of this allegation is that the County "took no disciplinary action" against Roberts in response to Plaintiff's claim. *Id.* In his opposition to summary judgment, Plaintiff argues that the County "performed no investigation of the incidents involving [Plaintiff] beyond accepting Roberts' report of his version of events." ECF 39 ("Opp.") at 22. In support of this argument, Plaintiff cites deposition testimony from Deputy Roberts that he gave a written statement, then heard nothing further about the investigation. Roberts Depo. at 159-162. Roberts also testified that he did not know if any other witnesses had been interviewed. Roberts Depo at 161. Plaintiff also states that he was never interviewed. Simonelli Decl. at ¶ 24. At the summary judgment hearing, Plaintiff's counsel stated that Plaintiff had requested documents concerning the investigation during discovery and received none.[2]

**E.  This lawsuit**

On March 16, 2017, Plaintiff filed this lawsuit against the County and Deputy Roberts, seeking money damages on claims against both of them for violation of his civil rights, discrimination on the basis of disability, and assault and battery. ECF 1 (Complaint).

**II.  Summary Judgment Standard**

Summary judgment is appropriate if the moving party shows that there is no genuine dispute as to any material fact and the party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1985). A genuine dispute of material fact exists if there is

---

[2] The record does not reflect either the specific discovery requests or any effort by Plaintiff to address Defendants' assertions of privilege and work product.

sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id*. Even if summary judgment is not available on all claims in a case, a party may obtain partial summary judgment on a claim, defense, or portion thereof. Fed. R. Civ. P. 56(a).

The party moving for summary judgment bears the initial burden of informing the court of the basis for the motion and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party meets its initial burden, the burden shifts to the nonmoving party to produce evidence supporting its claims or defenses. *Id*. at 1103. If the nonmoving party does not produce evidence to show a genuine issue of material fact, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

"The court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014). However, "the mere existence of a scintilla of evidence in support of the plaintiff's position" is insufficient to defeat a motion for summary judgment. *Id*. (quoting *Anderson*, 477 U.S. 242, 252 (1986)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id*. (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

**III.    Discussion**

**A.    Section 1983 Claim**

Plaintiff's first cause of action against the County and Deputy Roberts is a claim under 42 U.S.C. § 1983 for violation of his civil rights. Complaint at ¶¶ 48-53. Specifically, Plaintiff claims that he was deprived of (1) his rights under the First and Fourteenth Amendments of the United States Constitution to free speech, association, and petition, and his constitutional right to

United States District Court
Northern District of California

1   attend and observe judicial proceedings, and (2) his rights under the Fourth and Fourteenth

2   Amendments to be free from unreasonable seizure and the use of unnecessary and unreasonable

3   force against his person. *Id.* at ¶ 49.

4       Deputy Roberts moves for summary judgment on the Section 1983 claim on the ground of

5   qualified immunity. The County moves for summary judgment on the ground that under *Monell v.*

6   *Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 690-91 (1978), Plaintiff cannot maintain a

7   Section 1983 claim against the County because he can cite no County policy, custom, or practice

8   that resulted in the alleged incidents.

9                  **1.      Deputy Roberts' Qualified Immunity Claim**

10                     **a)      Legal standard for qualified immunity**

11      "The doctrine of qualified immunity protects government officials from liability for civil

12  damages 'unless a plaintiff pleads facts showing (1) that the official violated a statutory or

13  constitutional right, and (2) that the right was 'clearly established' at the time of the challenged

14  conduct.'" *Wood v. Moss*, 134 S. Ct. 2056, 2066–67 (2014) (quoting *Ashcroft v. al-Kidd*, 131 S.

15  Ct. 2074, 2080 (2011)).

16      The analysis of qualified immunity entails a two-part inquiry. First, the court must

17  determine whether, "[t]aken in the light most favorable to the party asserting the injury, do the

18  facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S.

19  194, 201 (2001). Second, if the court determines that a constitutional violation could be made out

20  based on the parties' submissions, the court must determine whether the constitutional right was

21  "clearly established" at the time of the violation such that it would be clear to a reasonable officer

22  that his conduct was unlawful in the situation he confronted. *Id*. at 201-02. The Supreme Court

23  has clarified that the sequence of analysis set forth in *Saucier* is not mandatory and that a court

24  may exercise its sound discretion in determining which of the two prongs of the qualified

25  immunity analysis to address first. *Pearson v. Callahan*, 555 U.S. 223, 241-42 (2009). "Thus, in

26  some cases, it may be unnecessary to reach the ultimate constitutional question when officers

27  would be entitled to qualified immunity in any event, a result consistent with longstanding

28  principles of judicial restraint." *Parenti v. County of Monterey*, No. 14-cv-05481-BLF, 2018 WL

1697110, at *6 (N.D. Cal. Apr. 6, 2018).

Because qualified immunity is a defense from suit, not merely from liability, "the Supreme Court has 'repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in litigation.'" *Dunn v. Castro*, 621 F.3d 1196, 1199 (9th Cir. 2010) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).

In this case, Plaintiff predicates his Section 1983 claim on a violation of his First and Fourth Amendment rights, made applicable to the states through the Fourteenth Amendment.

### b) Section 1983 Claim Based on First Amendment Rights

### (1) Constitutional violation

Under the first prong of the qualified immunity analysis, the Court must consider whether, taken in the light most favorable to the party alleging the injury, the facts alleged show that Deputy Roberts' conduct violated a constitutional right. *Saucier*, 533 U.S. at 201. A Section 1983 claim may be based on violation of a plaintiff's First Amendment rights. *See, e.g., Eagle Point Education Ass'n v. Jackson Cty. Sch. Dist.*, 880 F.3d 1097, 1108 (9th Cir. 2018) (affirming summary judgment in favor of plaintiffs in Section 1983 action asserting that school district policies infringed their First Amendment rights).

Plaintiff's First Amendment claim in this case arises from his assertion that he had a right to attend civil court proceedings, citing *Huminski v. Corsones*, 386 F.3d 116, 144-147 (2d Cir. 2004) and other cases. Specifically, Plaintiff claims that Deputy Roberts' actions resulted in Plaintiff's exclusion from the courtroom in violation of his First Amendment right to attend judicial proceedings. Opp. at 15. At the summary judgment hearing, Plaintiff's counsel identified the following events during the April 8, 2016 incident as evidence of Plaintiff's exclusion from the courtroom: Deputy Roberts removed him from the courtroom; Deputy Roberts struck Plaintiff in the chest with a closed fist in the hallway; and when the backup deputy arrived in the hallway, he told Plaintiff to "stay here" while the backup deputy tried to obtain the lawyer-witness's business card.

There is no dispute that Plaintiff returned to Department 15 on multiple occasions following the April 8 incident, thus indicating that Plaintiff does not contend he was permanently

10

barred from that courtroom.  As for the events of October 21, 2016, taking as true Plaintiff's allegations that he was told after his hearing was over to leave the courtroom, they simply do not amount to his exclusion from the courtroom.

What remains is Plaintiff's claim arising out of his alleged exclusion from the April 8 hearing following his ejection from the courtroom.  Several factors are relevant to the Court's consideration of that claim.  First, the parties agree that a courtroom is a nonpublic forum.  *See Berner v. Delahanty,* 129 F.3d 20, 26 (1st Cir. 1997) ("A courthouse—and, especially, a courtroom—is a nonpublic forum")*; see also Sammartano v. First Jud. Dist. Court*, 303 F.3d 959, 966 (9th Cir. 2002), *abrogated on other grounds by Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (holding that city public safety complex that includes courtrooms and other court-related offices was a nonpublic forum).  As such, the government may restrict access "as long as the restrictions are reasonable and [are] not an effort to suppress expression merely because the public officials oppose the speaker's views." *Sammartano*, 303 F.3d at 965 (citations omitted).  There must be "evidence that the restriction reasonably fulfills a legitimate need," but "[t]he government need not choose the least restrictive alternative when regulating speech in a nonpublic forum." *Id.* at 967.

Second, "[w]hat is called the 'right' of access [to court proceedings] is, however, only a presumption of access." *Huminski*, 386 F.3d at 148.  When a limited closure, especially one that extends to a single person, is at issue, there need only be a "substantial reason" for the closure. *Id.* at 148-49.  That is not an especially high bar.  Court personnel "must at least have the ability to close the courtroom door to any person whom they reasonably think may pose a threat to person, property, or decorum." *Id.* at 149.  Accordingly, "[a] potential spectator may be excluded from a courtroom on a simple issue of propriety," such as "unruly behavior." *Id.*

Here, most critically, there is no evidence to support a finding that Plaintiff was barred from the courtroom on April 8 (or at any other time).  Although Deputy Rogers escorted Plaintiff out of the courtroom on April 8, Deputy Rogers reentered the courtroom, leaving Plaintiff in the hallway.  Plaintiff does not allege that he was told not to return.  Plaintiff does claim that the backup deputy told him in the hallway to "wait here," but that was in the context of the backup

deputy offering to assist Plaintiff in obtaining contact information from the lawyer-witness. It cannot reasonably be inferred from the backup deputy's comment that Plaintiff was ordered not to reenter the courtroom. Finally, Plaintiff admits that he left the courthouse of his own volition after his mother exited the courtroom and said she wanted to leave. Plaintiff also admits that he returned to Department 15 repeatedly after April 8.

The Court finds that Plaintiff has failed to identify a genuine issue of material fact concerning his claim that Deputy Roberts barred him from the courtroom in violation of his First Amendment rights.

### (2) Clearly established constitutional right

Because Plaintiff has not demonstrated that his rights under the First Amendment were violated, the Court need not reach the second prong of the qualified immunity analysis, which considers whether the First Amendment rights upon which Plaintiff relies were "clearly established." *See generally Pearson*, 555 U.S. at 241-42.

### c) Section 1983 Claim Based On Fourth Amendment Rights

### (1) Constitutional violation

Plaintiff also asserts a Section 1983 claim based on his right under the Fourth Amendment to be free of excessive force. Claims of excessive force are governed by the Fourth Amendment and its "reasonableness" standard. *See Graham v. Connor*, 490 U.S. 386, 395 (1989). That analysis requires balancing the "nature and quality of the intrusion" on a person's Fourth Amendment interests against the "countervailing governmental interests at stake." *Id*. at 396. "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Id*. at 397 (citations omitted); *see also Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (court must "examine the totality of the circumstances" in analyzing whether force used was reasonable).

The Ninth Circuit has stated that because the requisite balancing between the governmental interest at stake and the level of force used "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, … summary judgment … in excessive force cases should be granted sparingly." *Santos v. Cates*, 287 F.3d 846, 853 (9th Cir. 2002) (citation

omitted).  "Summary judgment may be appropriate, however, when the facts concerning an incident are largely undisputed."  *Acasio v. Lucy*, No. 14-cv-04689-JSC, 2017 WL 1316537, at *6 (N.D. Cal. Apr. 10, 2017) (*citing Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)).

Here, the parties dispute the key facts concerning the considerations the Court must balance with respect to the April 8, 2016 incident:  how disruptive Plaintiff was inside the courtroom, and how much force Deputy Roberts used on Plaintiff.  Nevertheless, Defendants argue that they are entitled to summary judgment even under Plaintiff's version of the facts.

Specifically, Defendants argue that neither *de minimis* force nor "minor affronts to one's dignity" can support a claim for excessive force.  *See* Motion at 13-14.  However, the Court cannot conclude as a matter of law that Deputy Roberts' April 8 actions were objectively reasonable where Plaintiff claims that he whispered two questions to an observer in the courtroom and then Deputy Roberts, without warning, grabbed Plaintiff's arm, pulled him out of the courtroom into the hallway, and punched Plaintiff in the chest with a closed fist.  Under these circumstances, Deputy Roberts cannot demonstrate that he is entitled to qualified immunity for forcibly removing Plaintiff from the courtroom.  Where, as here, "there are factual disputes about the type and amount of force used and the circumstances that led up to the use of force," summary judgment is not appropriate.  *Acasio*, 2017 WL 1316537, at *8.  "More importantly, accepting Plaintiff's version of events as true and drawing all inferences in [his] favor, a reasonable jury could find that [the officer]'s force was unreasonable and, consequently, that he violated Plaintiff's right to be free from excessive force."  *Id.*  Although Defendants are correct that "not every push or shove" violates the Fourth Amendment (see Motion at 13-14), that argument does not absolve Deputy Roberts of potential liability for his conduct towards Plaintiff because, in at least some circumstances, a push when no force is needed may be excessive force.  *See id.* at *9.

By contrast, with respect to the October 21, 2016 incident, the Court finds that Deputy Roberts is entitled to summary judgment on his qualified immunity defense to Plaintiff's Fourth Amendment-based claims.  Even under Plaintiff's version of events, Deputy Roberts only touched Plaintiff on the chest after Plaintiff spoke to the court reporter.  The Ninth Circuit has made clear that "[s]ome bodily intrusions may be provably accidental or *de minimis* and thus constitutionally

reasonable." *Fontana v. Haskin*, 262 F.3d 871, 880 (9th Cir. 2001). Here, considering the totality of the circumstances of October 21 as alleged by Plaintiff, the Court does not find a triable issue of material fact regarding Deputy Roberts' alleged use of excessive force in violation of Plaintiff's Fourth Amendment rights.

**(2)    Clearly established constitutional right**

The Supreme Court recently reiterated the long-standing principle that a "clearly established" constitutional right "should not be defined at a high level of generality" but must be "particularized" to the facts of the case. *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (citations and quotation marks omitted). Defining the right at too high a level of generality "avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Ricard*, 134 S. Ct. 2012, 2023 (2014). "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id.* "In other words, 'existing precedent must have placed the statutory or constitutional question' confronted by the official 'beyond debate.'" *Id.* (quoting *al-Kidd*, 563 U.S. at 741).

The plaintiff generally bears the burden of identifying a case where an officer acting under similar factual circumstances was held to have violated the constitution. *Sharp v. County of Orange,* 871 F.3d 901, 911 (9th Cir. 2017). "[T]he prior precedent must be 'controlling'—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction." *Id.* (citing *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). The Ninth Circuit has often required the plaintiff opposing a claim of qualified immunity to identify a case imposing liability on an officer under nearly identical facts. *See, e.g., Pederson v. Klamath County,* 692 Fed. App'x 473, 474 (9th Cir. 2017) (affirming district court's grant of summary judgment to deputies on Section 1983 claim where plaintiff "has not identified a case in which officers searching for a child pursuant to a protective custody order that authorized entry into a residence where that child is located were found to have violated the Fourth Amendment.").

Nevertheless, the Supreme Court has made clear that even in the absence of such particularized case law, "a general constitutional rule already identified in the decisional law may

14

apply with obvious clarity to the specific conduct in question." *United States v. Lanier,* 520 U.S. 1219, 1227 (1997)*; see also White*, 137 S. Ct. at 552 ("general statements of the law are not inherently incapable of giving fair and clear warning to officers, but in light of pre-existing law the unlawfulness must be apparent." (citations and quotation marks omitted)). Similarly, the Ninth Circuit has stated that "[a] right can be clearly established despite a lack of factually analogous preexisting case law, and officers can be on notice that their conduct is unlawful even in novel factual circumstances." *Ford v. City of Yakima*, 706 F.3d 1188, 1195 (9th Cir. 2013); *see also Lopez v. Gelhaus*, 871 F.3d 998, 1017 (9th Cir. 2017) (holding that a right can be clearly established despite the absence of "a case directly on point."). "The relevant inquiry is whether, at the time of the officers' action, the state of the law gave the officers fair warning that their conduct was unconstitutional." *Ford*, 706 F.3d at 1195.

Here, the Court cannot conclude on summary judgment that Plaintiff's Fourth Amendment right to be free of grabbing and punching in his removal from the courtroom for briefly whispering to another spectator was not clearly established. To the extent that the Plaintiff must identify a particular case that would have given Deputy Roberts fair warning that his conduct was unconstitutional, Plaintiff has adequately done so. For example, in *P.B. v. Koch*, a controlling case that predated the events at issue here, the Ninth Circuit concluded that a high school principal had violated three students' clearly established rights. 96 F.3d 1298, 1304 (9th Cir. 1996). The principal slapped student N.B. in the face and grabbed and squeezed his neck without warning after the student said "Heil Hitler" as the principal walked by. *Id.* at 1300. The principal grabbed student L.G. by the arm, pulled him outside the gym, and punched him in the chest after the student failed to heed the principal's request to be quiet during a service, which the student did not hear. *Id.* The principal snatched the hat off the head of another student, D.D., after the student put it back on after being asked to remove it, then grabbed the student by the neck and threw him headfirst into the lockers. *Id.* The court held that, "[i]n the instant case, there was no need to use force against the three students" and therefore the alleged "slapping, punching, and choking the students—bears no reasonable relation to the need." *Id.* at 1304; *see also Young v. County of Los Angeles*, 655 F.3d 1156, 1167 (9th Cir. 2011) (case cited by Plaintiff in which officer's use of

1    pepper spray and baton blows in response to a plaintiff's failure to obey an order to get back in his

2    car was held to be plainly in excess of the force needed under the circumstances).

3           To be sure, Plaintiff has not identified a case from the Supreme Court or Ninth Circuit in

4    which an officer was held liable under precisely the facts of this case.  But the Ninth Circuit has

5    held repeatedly that "where there is no need for force, *any* force used is constitutionally

6    unreasonable," in the cases cited by Plaintiff and others.  *See, e.g., Headwaters Forest Defense. v.*

7    *County of Humboldt*, 240 F.3d 1185, 1199 (9th Cir. 2001) (emphasis in original), *vacated and*

8    *remanded on other grounds sub nom. County of Humboldt v. Headwaters Forest Defense,* 534

9    U.S. 801 (2001); *see also Blankenhorn v. City of Orange*, 485 F.3d 463, 481 (9th Cir. 2007)

10   (citing *Graham*'s "clear principle" that "force is only justified when there is a need for force);

11   *Motley v. Parks,* 432 F.3d 1072, 1088 (9th Cir. 2005) ("The use of force against a person who is

12   helpless or has been subdued is constitutionally prohibited."), *overruled on other grounds in*

13   *United States v. King*, 687 F.3d 1189 (9th Cir. 2012); *Fontana v. Haskin*, 262 F.3d 871, 880 (9th

14   Cir. 2001) ("Gratuitous and completely unnecessary acts of violence by the police during a seizure

15   violate the Fourth Amendment.").

16          The Court finds these and similar cases were sufficient to put Deputy Roberts on notice

17   that his conduct, as alleged by Plaintiff, was unlawful even in the somewhat different factual

18   circumstances of this case.  *See Ford*, 706 F.3d at 1195  Such cases, which establish that an officer

19   may not use force where no force is necessary, apply with "obvious clarity" to the situation

20   allegedly confronted by Deputy Roberts and make the unlawfulness of his alleged force

21   "apparent."  *White*, 137 S. Ct. at 552.  Police officers are entitled to use different degrees of force,

22   ranging from no force to deadly force, depending on the particular situation they encounter.  The

23   case law concerning the permissible use of force in various factual situations in which an officer is

24   entitled to use some level of force (for example, in making an arrest) is well-developed, and thus a

25   requirement that the plaintiff on whom force has been used in such circumstances must identify a

26   case that is factually similar is understandable.  But that requirement does not make sense in the

27   context of an officer's use of force where none is required.  There are countless situations in which

28   an officer is *not* entitled to use any force, and it is not reasonable to expect or require that there be

case law precisely addressing each such situation before that officer may be held liable for using force. *See Lanier*, 117 S. Ct. at 1227-28 ("The easiest cases don't even arise. There has never been … a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages [or criminal] liability." (citation omitted)). "After all, if qualified immunity provided a shield in all novel factual circumstances, officials would rarely, if ever, be held accountable for their unreasonable violations of the Fourth Amendment." *Bonivert v. City of Clarkston,* 883 F.3d 865, 872-73 (9th Cir. 2018) (quotation marks and citation omitted). Requiring a plaintiff upon whom force has been used where no force was necessary to identify a case precisely on point to overcome a claim of qualified immunity also would have the perverse effect of giving officers more latitude to use unnecessary force in such no-force-needed situations than they have in situations where force is permitted.

Taking Plaintiff's allegations as true, Deputy Roberts was not required to use any force—much less grabbing Plaintiff's arm or punching him—to achieve the governmental interest in maintaining order in the courtroom. As such, the cases identified by Plaintiff and similar Ninth Circuit cases were sufficient to put a reasonable officer on notice that the use of force was not constitutionally permitted. Of course, Defendants actually dispute what happened on April 8, but that is further reason to deny summary judgment on Deputy Roberts' qualified immunity defense. *See Lopez*, 871 F.3d at 1021 (holding summary judgment not appropriate "[b]ecause [the officer's] entitlement to qualified immunity depends on disputed factual issues").

Although Defendants are not required to identify a prior case applying qualified immunity in the same factual circumstances, they claim they have found one in *Brooks v. Clark Cty.,* 828 F.3d 910 (9th Cir. 2016). In *Brooks*, a courtroom marshal was accused of using excessive force when executing a judge's order to remove a disruptive individual (Brooks) from her courtroom. *Id.* at 915. Brooks and two men who accompanied him were bail agents who repeatedly tried to take into custody two women who were appearing in court. *Id.* at 914. The marshal shoved Brooks through the courtroom doors, allegedly injuring his back. *Id.* The court in *Brooks* dismissed the complaint against the marshal on the ground of qualified immunity. *Id.* at 921.

*Brooks* is distinguishable. In that case, Brooks' disruption of the courtroom was beyond dispute because there was a transcript of his interruptions of the judge and his defiance of the judge's orders. The court characterized the courtroom environment as "chaos" after Brooks and his compatriots repeatedly defied orders from the judge and marshal to leave and harassed and intimidated two women in the courtroom. *Id.* The "chaos" in Brooks is in contrast to the courtroom environment at issue here, in which, according to Plaintiff, he whispered two questions to a court observer and there was no blanket policy against talking in the courtroom. The court also noted that Brooks' allegations regarding the force used by the marshal were "barebones" (*id.*), whereas Plaintiff has explained the force used by Deputy Roberts in more detail.

In sum, any reasonable deputy would know that he or she was violating Plaintiff's rights if, in response to brief whispering in the courtroom, he grabbed Plaintiff, forced him from the courtroom, and punched him in the chest. *See generally Headwaters Forest Def. v. County of Humboldt*, 240 F.3d at 1199. Accordingly, Deputy Roberts is not entitled to summary judgment of qualified immunity for his actions on April 8, 2016.

### d) Conclusion on Deputy Roberts' qualified immunity claim

For the reasons set forth above, the Court finds that Deputy Roberts is entitled to summary judgment on his qualified immunity defense to Plaintiff's Section 1983 claim as it relates to (1) Plaintiff's claim derived from the First Amendment and (2) Plaintiff's claim derived from the Fourth Amendment in connection with the October 21, 2016 incident. The Court denies Deputy Roberts' motion for summary judgment on his qualified immunity defense as it relates to Plaintiff's claim under the Fourth Amendment in connection with the April 8, 2016 incident.

### 2. The County's Claim of No *Monell* Liability

Plaintiff asserts his first cause of action for violation of Section 1983 against not only Deputy Roberts, but also the County. Complaint at ¶¶ 51-52 and Prayer. There is no *respondeat superior* liability under Section 1983; no entity is liable simply because it employs a person who has violated a plaintiff's rights. *Monell*, 436 U.S. at 691. A local governmental entity can be sued directly under Section 1983 only if the entity maintains a policy or custom that results in a violation of plaintiff's constitutional rights. *Id.* at 690-91. The Ninth Circuit has explained that

there are three ways to show such a policy or custom: "(1) by showing a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity; (2) by showing that the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision; or (3) by showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate." *Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005) (quotation marks and citations omitted).

Here, Plaintiff's Section 1983 claim against the County is premised on the County's alleged "ratification" of Roberts' conduct. Complaint at ¶ 51. Plaintiff argues, without factual support, that the County ratified Deputy Roberts' conduct by conducting an investigation that was inadequate because it simply relied on Deputy Roberts' version of events and failed to investigate further, despite the County's own policies requiring investigation of all reports of use of force. Opp. at 22.

"Finding that an officer acted within policy does not alone amount to *Monell* ratification." *Weishaar v. County of Napa,* Case No. 14-cv-01352-LB, 2016 WL 7242122, at *14 (N.D. Cal. Dec. 15, 2016) (citations omitted). "[I]n order for there to be [*Monell*] ratification, there must be 'something more' than a single failure to discipline or the fact that the policymaker concluded that the defendant officer's actions were in keeping with the applicable policies and procedures." *Id.* (citations omitted); *see also Sheehan v. Bay Area Rapid Transit*, Case No. 14-cv-03156-LB, 2016 WL 777784, at *14 (N.D. Cal. Feb. 29, 2016) ("The law does not state that, whenever an investigative group accepts an officer's version over a victim's differing version, this acceptance establishes a policy for which a municipality may be held liable under § 1983 … The law clearly requires 'something more') (citation omitted)).

"This 'something more' may be an 'obviously flawed investigation.'" *Weishaar,* 2016 WL 7242122, at *14 (citations omitted). In *Larez v. City of Los Angeles*, for example, the Ninth Circuit affirmed a jury verdict holding a police chief liable in his official capacity under *Monell* where the plaintiff's complaint was investigated by the very unit that had allegedly committed the constitutional violation and had other "holes … that should have been visible to any reasonable

police administrator," such as reliance upon the testimony of one officer to substantiate the other defendants' claims that they did not engage in excessive force, even though that officer was not present at all relevant times. 962 F.2d 630, 647 (9th Cir. 1991). Moreover, there was evidence in that case that over a period of two years, the police department almost never imposed discipline as a result of a citizen complaint. *Id.*

Absent the type of evidence present in *Larez*, a ratification argument premised entirely on the fact that the government entity's post-incident investigations exonerated the officer is "legally insufficient." *Sheehan*, 2016 WL 777784, at *13.

Generally, ratification is a question of fact for the jury, but "a plaintiff must establish that there is a genuine issue of material fact regarding whether a ratification occurred." *Chavez v. City of Hayward*, No. 14-CV-00470-DMR, 2015 WL 3833536, at *8 (N.D. Cal. June 19, 2015).

Here, Plaintiff's ratification claim is based on only two facts: the County did not interview Plaintiff in connection with the April 8, 2016 incident; and the County has not taken disciplinary action against Deputy Roberts. Although Plaintiff argues that the County only considered Roberts' version of events, Plaintiff offers no evidence in support of the implication that no other witnesses were interviewed. Further, this argument ignores Plaintiff's detailed written report to the County setting forth his own version of events. *See* Ex. 3 to Simonelli Decl.

Plaintiff bears the burden of producing evidence to show a genuine issue of material fact. *Nissan*, 210 F.3d at 1103. Plaintiff has failed to meet this burden on the *Monell* claim against the County. The unsupported allegations of irregularities in the investigation cited by Plaintiff do not establish ratification. The failure of the County to discipline Deputy Roberts, without more, is not enough to establish that the County ratified his conduct. Accordingly, the City is entitled to summary judgment on Plaintiff's Section 1983 claim.

### B.    Americans with Disabilities Act Claim

Plaintiff's second cause of action seeks monetary damages for violation of the Americans with Disabilities Act ("ADA"). To state a claim under Title II of the ADA, Plaintiff must show: (1) he is a qualified individual with a disability; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise

discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability. *Weinreich v. Los Angeles Cty. Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997). Recovery of damages requires proof of intentional discrimination, which is satisfied by a showing that the defendant acted with deliberate indifference. *Duvall v. City of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001).

Here, Defendants do not dispute that Plaintiff's medical conditions qualify him for ADA protection. However, Plaintiff has not come forward with evidence to support the other elements of a claim for violation of the ADA. His ADA claim appears to be based on a theory that he was excluded from the courtroom (*see* Complaint at ¶ 55), but as discussed above, Plaintiff has not come forward with evidence sufficient to support that claim. Even if he had such evidence, however, Plaintiff's ADA claim would still fail because he has no evidence that his alleged exclusion from the courtroom was "by reason of" his disability. To satisfy this element of an ADA claim, Plaintiff need not show that his disability was the sole reason for Defendants' conduct, but he must show that his disability was a "motivating factor." *Head v. Glacier Nw., Inc.*, 413 F.3d 1053, 1066 (9th Cir. 2005), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).

Plaintiff has identified no evidence that his disability was a motivating factor in Deputy Roberts' conduct. Plaintiff argues that in connection with the April 8, 2016 incident, "[a] reasonable jury could conclude that Roberts intended to show [Plaintiff] how easy it would be for Roberts to hurt [Plaintiff] because of his disability." Opp. at 23. Specifically, Plaintiff testified as follows at his deposition:

> Q: So why – why do you allege [Deputy Roberts used physical force] because of your disability versus, say, because he thought you were being disruptive in court or because he thought you were annoying for some other reason? Why do you say it was because of your disability?
>
> A: Because when someone has a disability, they, to some people, appear more vulnerable; and, therefore, some people think they can get away with more if someone has a disability, whereas I really don't think, you know, Mr. Roberts would have been touching a linebacker on either of the instances. So there had to be something that showed weakness, being a disability, it appears to me that caused him to basically say, "I can – I can physically touch and force myself on

somebody," on me.

Simonelli Depo. at 120-21.

Plaintiff thus argues that a jury could infer that Deputy Roberts had discriminatory intent. But an inference cannot be based on such speculative and conclusory testimony as provided by Plaintiff in deposition. *See Lakeside-Scott v. Multnomah County*, 556 F.3d 797, 808 (9th Cir. 2007). "A party opposing summary judgment is entitled to the benefit of only *reasonable* inferences that may be drawn from the evidence put forth," and a reasonable inference must be based on "significant probative evidence," not "threadbare conclusory statements." *Barnes v. Arden Mayfair, Inc.*, 759 F.2d 676, 680-81 (9th Cir. 1984) (emphasis in original). Plaintiff provides no facts linking Deputy Roberts' conduct on April 8 to Plaintiff's disability.

Plaintiff's further argument that a jury could reasonably infer from Deputy Roberts' alleged statement on April 8 mocking Plaintiff's admission to practice in Utah, rather than California, that "Roberts viewed [Plaintiff's] disabilities as making him a second-class lawyer that should be excluded from helping his mother in the courtroom" (Opp. at 23) also fails because Plaintiff has not demonstrated any connection between his disability and his admission (or non-admission) to practice in various states.

In connection with the October 21, 2016 incident, Plaintiff argues that "[a] jury could proper[l]y conclude that [Roberts' demand that Plaintiff write down questions] and the ejection following Plaintiff's request to the court reporter for accommodation of his disability shows that [Plaintiff's] ejection was motivated by Roberts' hostility to [Plaintiff's] disabilities and [Plaintiff's] effort to obtain accommodations so he could help his mother's case." Opp. at 24. Again, Plaintiff lacks any factual basis upon which a jury could properly infer a link between Deputy Roberts' conduct and Plaintiff's disability.

According to Plaintiff, he was escorted out the courtroom on both April 8 and October 21 for talking in the courtroom. Plaintiff alleges that he has "vision and motion disabilities" that affect his "balance, coordination, walking, running and fine motor abilities, including [his] ability to write on paper" and impair his vision. Simonelli Decl. at ¶ 2. None of Plaintiff's disabilities are linked to his ability to speak. Nor is there any other evidence that Plaintiff's disability was a

motivating factor for his ejection from the courtroom.

The mere fact that Plaintiff is disabled does not, without more, provide a proper basis upon which a jury may infer that his disability was a motivating factor in Deputy Roberts' conduct or statements towards Plaintiff. Accordingly, Defendants are entitled to summary judgment on Plaintiff's claim for violation of the ADA.

## C.      Assault and Battery Claim

Both Defendants also argue that they are entitled to summary judgment on Plaintiff's third cause of action, which is a claim under state law for assault and battery.

### 1.      Deputy Rogers

Defendants argue that Deputy Roberts' liability for assault and battery depends on an analysis that "is largely the same" as the excessive force analysis under 42 U.S.C. § 1983. Motion at 22. Plaintiff disagrees, arguing that government tort liability encompasses a broader spectrum of conduct than excessive force claims under the Fourth Amendment. Opp. at 25. The Court need not resolve this dispute because, as discussed above, Deputy Roberts is not entitled to summary judgment on the excessive force claim under Section 1983 and thus is not entitled to summary judgment even under Defendants' narrower construction of California law.

### 2.      The County

Defendants argue that the County is entitled to summary judgment on Plaintiff's state law assault and battery claims under California Government Code § 815(a), which provides that "[e]xcept as otherwise provided by statute, [a] public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person." Motion at 19. Again, Plaintiff disputes Defendants' analysis, arguing that public entities are generally liable for injuries caused by the negligence of their employees acting within the scope and course of their employment. Opp. at 24-25 (citations omitted).

The County has not established that it is entitled to summary judgment on Plaintiff's state law claims. California Government Code § 815.2, cited by Plaintiff, provides:

////

////

United States District Court
Northern District of California

(a) A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative.

(b) Except as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability.

It thus appears that the County's liability derives from the liability of its employee, Deputy Roberts. Because, as discussed above, Deputy Roberts is not entitled to summary judgment on the assault and battery claims, it follows that the County is likewise not entitled to summary judgment on those claims.

## IV.     Conclusion

For the foregoing reasons, the Court GRANTS partial summary judgment in favor of Defendants on (1) Plaintiff's Section 1983 claim against Deputy Roberts insofar as it is based on the alleged violation of Plaintiff's First Amendment rights; (2) Plaintiff's Section 1983 claim against Deputy Roberts insofar as it is based on the alleged October 21, 2016 incident; (3) Plaintiff's Section 1983 claim against the County; and (4) Plaintiff's ADA claim against both Defendants. Defendants' motion for summary judgment is otherwise DENIED.

**SO ORDERED.**

Dated: June 22, 2018

_____
SUSAN VAN KEULEN
United States Magistrate Judge